RUSSELL, Judge.
The paternal grandmother of R.N.C. filed a petition in the trial court on November 6, 1989, seeking temporary custody of the child. The grandmother’s son, the putative father of the child, filed an affidavit stating that he felt that it would be in the best interest of the child for the grandmother to have temporary custody. The trial court awarded temporary custody to the grandmother on the same date.
On February 28, 1991, the mother filed a petition stating that custody had been taken from her without her permission, that she is a fit and proper person to have custody of the child, and that it is in the child’s best interest to be returned to her. The trial court ordered that a home study be conducted by the Department of Human Resources (DHR) on the grandmother and the mother. After an ore tenus proceeding held on October 24, 1991, the trial court found that the mother and the father are unfit to have custody of the child. It continued custody of the child with the grandmother. The mother appeals. We reverse and remand.
The record reveals that the grandmother has had custody of the child since the child was approximately seven months old. At that time the mother, who was living with the putative father, prior to entering Brookwood Hospital for treatment asked the grandmother to care for the child. On leaving the hospital, the mother went from Birmingham to Montgomery with another patient, instead of returning to the putative father. She remained absent for approximately one week, and during this time the grandmother petitioned for and was granted temporary custody of the child. The record provides no evidence of any notice to the mother. The mother returned to the putative father, and the child was returned to them. However, the order for temporary custody apparently remained in effect.
The mother and the child subsequently left the putative father. However, the mother complied with DHR’s demand that she turn the child over to it. The mother now lives in New York with her six-month-old son and her fiance, who is the father of her son.
The mother testified to the following: Another man, rather than the putative father, is the child’s father. The putative father is an alcoholic who beat her when she lived with him and caused her to be hospitalized two times. Although she asked the putative father to marry her a number of times, they were never married. She was hospitalized for her nerves and was told that she was “codependent” on the putative father. She asked the grandmother to keep her child while she was under treatment.
She left the putative father when the child was seven months old. She and the child were taken to her sister’s house by the police after she was beaten by the putative father. Her emotional problems were caused by the putative father, and she no longer has a problem.
The mother returned to the putative father after going to Montgomery because he told her that she would never see the child again if she did not return. She complied with DHR’s request that she turn the child over to it because there was a warrant for her arrest for writing a $10 bad check, and she was threatened with arrest.
She moved into an apartment where she stayed for six months. During this time her mother would pick up the child and bring the child to her, and she would keep the child for the weekend. The mother then went to South Carolina to work for three months and in October 1990 moved to New York with her fiance.
She calls the grandmother “all the time” about the child, begs for pictures, and has tried to get the grandmother to bring the child to New York. She loves the child and feels that the child should be with her own mother, rather than the grandmother. She also feels that the grandmother is too old to continue to have custody.
When the mother saw the child for visitation before the hearing, the child ran to her calling her “Mommy.” The child loved playing with her half-brother. The mother now has a home and a family. Although she is a *918 printer by trade, she stays at home and cares for her son. She plans to marry her fiance.
The putative father testified that he and the mother had “spats” and that her description of being beaten was correct. He further stated that he keeps the child at times when he is not working and sees her at the grandmother’s home.
A friend of the mother’s from New York testified that the mother is a perfect mother with her son, that she is patient with him, and that she keeps the friend’s child for her while the friend works. She further testified that the mother’s fiance is a “great dad” to his and the mother’s son.
The grandmother testified that she is worried about stability if the mother gets the child. The grandmother’s ex-daughter-in-law testified that the grandmother is energetic and provides a loving home and a loving environment.
A social worker with DHR recommended that the mother visit with the child before the child moves back with the mother. She also stated that the mother is in a stable environment; however, the worker was concerned about a comment made by the mother’s fiance in the home study report from New York, in which, she testified, the fiance stated that his twelve-year-old son from his former marriage had to be accepted by the mother and that he is willing to accept the mother’s child.
A home study report prepared by a probation officer was received from the New York Department of Probation. The officer recited facts similar to those disclosed in the record. In addition, she stated the following: The mother and her fiance live in an apartment located in a middle-class, suburban area. The apartment has a kitchen, living room, dining room, one bathroom, and two bedrooms. It is well furnished, and housekeeping standards are excellent. There is adequate room for the child. The fiance is very willing to accept the child into his home, and he feels that the mother is an excellent mother with their son. The officer also expressed concern about the child remaining in the custody of grandparents who are in their seventies. The mother told her that the grandmother said that if someone other than her son is proven to be the father, she would turn the child over to the mother right away. The mother maintains a good home situation, and her son is extremely well eared for. The officer’s opinion was that it would be in the child’s best interests to reside with her natural mother, “unless the Alabama Court is aware of circumstances of which this investigator has not been apprised.”
In its finding that both the mother and the putative father are unfit parents, the trial court stated that the mother has had a history of moving from city to city and has not shown to the court’s satisfaction that she can provide a stable home for the child. The putative father has not petitioned for custody-
The mother contends that the grandmother has not met her burden of proving that the mother is unfit to have custody of the child.
The mother has a presumptive superior right to the custody of her child as against a third person, which may be overcome only by “clear and convincing evidence that the parent is so unfit or unsuited for custody that the best interest of the child will be served by granting custody to the third person.” McLendon v. McLendon, 455 So.2d 861, 862 (Ala. Civ.App.1984). Stated another way, the mother must be guilty of such misconduct or neglect that she has been rendered an unfit and improper person to be entrusted with the care and upbringing of the child. Ex parte Terry, 494 So.2d 628 (Ala.1986). However, that presumption does not apply after a voluntary forfeiture of custody, or a prior decree removing custody, or temporary custody, from the natural parent and awarding it to a nonparent. Ex parte McLendon, 455 So.2d 863 (Ala.1984); Sims v. Sims, 515 So.2d 1 (Ala.Civ.App.1987).
In the present case, the mother alleges a deficiency in the award of the child to the grandmother because, she claims, she received no notice of the original action for temporary custody filed by the grandmother and had no opportunity to be heard. Generally, a custodial parent cannot be deprived of that custody, even temporarily, without being given adequate notice and an opportunity to *919 be heard. Webb v. Webb, 508 So.2d 281 (Ala.Civ.App.1987). Where these elements are missing, the evidentiary burden does not shift to the custodial parent. Id. The record indicates that the mother had no notice or opportunity to be heard when the initial custody order was entered; therefore, the burden remained with the grandmother, requiring a finding that the mother is unfit or unsuited for custody. C.G. v. C.G., 594 So.2d 147 (Ala.Civ.App.1991). In this matter the trial court made such a finding based on its determination that the mother had moved from “city to city” and had not shown that she can provide a stable home for the child. Therefore, we must determine whether the trial court erred in finding that the mother is unfit and in granting custody to the grandmother.
At the time of the hearing the mother had been in New York for approximately one year. After leaving Alabama and prior to moving to New York, she lived and worked in South Carolina for three months. The evidence indicates that her home situation in New York is good and that she is an excellent mother. She has overcome a most difficult situation and has been in a stable home situation for over a year. Considering the presumptive superior right of the mother to the custody of her child as against the grandmother, which was not ended by the defective original grant of temporary custody, and the requirement that the mother be guilty of such misconduct or neglect that she is unfit or unsuited for custody to overcome her superior right to custody, Terry, 494 So.2d 628, we hold that the trial court erred in awarding custody to the grandmother.
The judgment is reversed and the cause remanded with instructions to the trial court to enter an order granting custody of the child to the mother.
REVERSED AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and THIGPEN, J., concur.